**AMERICAN ROAD LINES**
**and Lexington Insurance**
**Company, Petitioners**

v.

**WORKERS' COMPENSATION**
**APPEAL BOARD (ROYAL),**
**Respondent.**

**Frederick Royal, Dec'd/ Darlene**
**Royal, Petitioner**

v.

**Workers' Compensation Appeal Board**
**(Ayerplace Enterprises, LLC, American Road Lines, Inc. and Uninsured Employer Guaranty Fund), Respondents.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Nov. 18, 2011.

Decided Feb. 23, 2012.

not raise this issue on appeal, so the issue is not before the Court.

Barry C. Shabbick, Palmerton, for petitioners Frederick and Darlene Royal.

Victor N. Lea, Allentown, for respondent Ayerplace Enterprises, LLC.

Kevin E. Harchar, Scranton, for respondent Uninsured Employer Guaranty Fund.

Michael A. Sebastian, Scranton, for respondent American Road Lines, Inc.

BEFORE: McGINLEY, Judge, and SIMPSON, Judge, and FRIEDMAN, Senior Judge.

OPINION BY Judge SIMPSON.

In this case involving potential joint employers in the trucking industry, we address whether the Workers' Compensation Appeal Board (Board) erred in reversing a Workers' Compensation Judge (WCJ) opinion and order finding an owner-operator and motor carrier jointly liable for the work-related injuries and death of their truck driver, Frederick Royal, (Decedent) under the Workers' Compensation Act (Act).[1] The Board found the motor carrier exercised sufficient control over Decedent to qualify as his employer, or, alternatively, qualified as his statutory employer under Section 302(a) of the Act, 77 P.S. § 461, and held the motor carrier solely liable. We affirm the result on alternate grounds.[2]

## I. Background

Decedent worked as a truck driver for Ayerplace Enterprises, LLC (Ayerplace), an owner-operator of a tractor, and Ameri-

1. Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. §§ 1–1041.4; 2501–2708.

2. *See, e.g., Morwald v. Workmen's Comp. Appeal Bd. (Eng'g & Refrigeration, Inc.),* 143 Pa.Cmwlth. 511, 599 A.2d 307 (1991) (agree-ing with claimant that the Board erred in requiring the nurse be a licensed psychotherapist when none exists, but affirming the decision on alternate grounds).

can Road Lines, Inc. (American), a motor carrier licensed under federal law.

While attempting to repair an air leak in one of the air brake lines on the trailer, owned by American, Decedent was run over by the rear drive wheels of the tractor, suffering serious injuries. At the time of the accident, Ayerplace owned its tractor through a lease-purchase agreement with Patriarch Leasing, a company affiliated with American.[3] Decedent was hospitalized from the date of injury until his death three months later. Decedent died as a result of his work injuries. Before his death, Decedent filed claim petitions against both American and Ayerplace. American and Ayerplace are separate companies that do not share common ownership.

### A. Procedural History

Decedent's widow, Darlene Royal (Claimant) filed fatal claim petitions against American and Ayerplace for the work-related death of her spouse. Ayerplace filed a joinder petition against American. Since Ayerplace did not have workers' compensation insurance at the time, the Uninsured Employer Guaranty Fund (Fund) was also named, and the WCJ consolidated the claim petition filed against the Fund with the other claims. Hr'g Tr., 9/15/08, at 13. The WCJ held a hearing at which representatives of the putative employers, insurers and Claimant/Decedent's widow presented testimony.

### 1. WCJ Hearing

Michael DeLuca testified as the sole employee and sole shareholder of Ayerplace about the relationship between Ayerplace and American and their respective functions related to Decedent. DeLuca/Ayerplace is an owner-operator of a single tractor leased exclusively to American for American's customers.

DeLuca testified about his communications with Decedent on the date of the incident. DeLuca assigned the trip to Decedent. Decedent advised DeLuca that he needed to drop the trailer, and seek a mechanic at the Geo Specialty plant. As the on-site Geo Specialty mechanic did not have what he needed, Decedent took the truck to DeLuca's mechanic, M & M Truck Service, as DeLuca directed. DeLuca directed Decedent to his mechanic "on behalf of himself, Ayerplace and American" and was prepared to pay for repairs. WCJ's Op., Finding of Fact (F.F.) No. 9. Decedent was in Geo Specialty's parking area when the accident occurred.

DeLuca testified that he began to operate "an outpost" for American in Allentown to tend to its primary customer, Geo Specialty. F.F. No. 8. DeLuca coordinated service for five or six drivers of five American-owned trucks, in addition to Decedent, who drove Ayerplace's tractor. DeLuca noted that Decedent did not complete any paperwork for Ayerplace. He explained that when a driver did not submit logs, American advised DeLuca, and DeLuca would ask the driver to submit them or "they are shutting you down." *Id.*

DeLuca testified that Ronald Holmes recommended Decedent as a driver, and Ayerplace required nothing more as far as testing or examination. For trips Decedent made that Ayerplace did not dispatch, DeLuca believed Decedent received payment from American. Otherwise, Ayerplace paid Decedent based upon payments it received from American. DeLuca explained he dispatched drivers, distributing

---

**3.** American, Patriarch Leasing and MIA, a staffing/employee recruiter/lessor, are all owned by the same individual and operate under the American Network corporate umbrella.

the loads assigned by American. DeLuca testified American could determine whether a driver could drive for American, as American, through Holmes, supplied the driver; Ayerplace only supplied the tractor. DeLuca directed all drivers he dispatched to take their trucks to M & M for repair.

DeLuca also drove for American. As a driver, he needed to complete his own forms to submit to American's company headquarters. DeLuca also had a fuel card issued by American, and American deducted the fuel charges before it issued payment to Ayerplace. DeLuca mailed his drivers' logs to American, and he noted Ayerplace never received Decedent's logs. American made all assignments for deliveries because Ayerplace had no customers of its own.

David Gress, chief operating officer of American Network, which controls American, MIA and Patriarch Leasing, oversaw general operations, contracts and subcontracts with owner-operators like DeLuca. Gress was familiar with the governing contracts, and he confirmed DeLuca was American's agent. DeLuca serviced its account with Geo Specialty and supplied the trucks. Gress testified that in order to drive each driver had to have an independent contractor contract for occupational accident insurance, or workers' compensation insurance. He noted some trip logs were sent directly to American and some directly to Ayerplace, where they were then consolidated and sent over night to American.

Ronald Holmes, American's field supervisor, testified regarding American's relationship to Decedent. Holmes, who was Decedent's first cousin, recruited Decedent as a driver through MIA, discussing the position as a "company driver." F.F. No.

11. Holmes assisted Decedent in completing MIA's driver qualification packet. Holmes had the authority to tell Decedent if he was not performing his duties properly, and the authority to train and to discipline Decedent.

He explained American could disqualify drivers, and "expect[ed] DeLuca to comply accordingly." *Id.* In 2007, American began converting its locations to "agent operations." *Id.* Holmes believed Decedent was an employee of Ayerplace, not of American. He also testified Ayerplace assigned drivers a piece of equipment when dispatching them.

The parties submitted three agreements between American and Ayerplace/DeLuca that govern their relationship: (1) the Equipment Lease Agreement (Lease); (2) the Independent Business Associate Contract signed by Ayerplace/DeLuca as contractor; and, (3) the Agency Agreement.

The Lease contains fairly standard language pertaining to motor carrier/owner-operator arrangements and respective responsibilities. As the motor carrier, American was responsible for doing background checks, drug-testing and receiving drivers' logs. American must ensure compliance with motor carrier regulations[4] governing leasing equipment to owner-operators, to include inspections, observing speed limits, maximum driving time/hours of service, 49 C.F.R. §§ 395.1, 395.3, and commercial driver's license standards, 49 C.F.R. § 383.37.

The Independent Business Associate Contract, signed on October 1, 2006, states that DeLuca, as contractor, is the employer of drivers and that American shall exercise no control over drivers. The contract also states that it was not intended to

---

4. American's Policies set forth many of the motor carrier regulations and explain how American requires compliance and sets standards higher than those required by law.

create an employer/employee relationship between American and drivers. The contract made DeLuca responsible for hiring, compensating, disciplining and terminating drivers, and obtaining workers' compensation insurance. F.F. No. 17.

The Agency Agreement executed on March 4, 2007, provides that Ayerplace is the contractor-agent that performs dispatch and coordination of transport on behalf of American, the carrier. Ayerplace is responsible for trailer rental, damage and maintenance. Pursuant to the Agency Agreement, Ayerplace cannot operate without American's permission. Ayerplace derives its authority to operate from American. Thus, Ayerplace is not in a position to lease its tractor/truck involved here to other customers or companies. The Agency Agreement provided it supersedes other contracts between the parties.

Claimant testified about the payments to her husband and about the paperwork in his possession when he was injured. She testified that she maintained the financial records for the family and that Decedent received checks from Ayerplace. At the time of injury, Decedent had a driver's history report from American identifying Decedent's trips. Also, Decedent had American pre/post trip inspection forms, with pre-paid envelopes addressed to American. In addition, he possessed American's Policies and Procedures. The truck Decedent drove had an American logo, and the tractor cab involved in the accident stated "American Road Lines." F.F. No. 7. Further, Decedent possessed a credit card that stated "Fleet One over the Road, American Road Lines, Inc." *Id.*

With regard to the **relationship** between American and Ayerplace, the WCJ found DeLuca had a contract with American as an owner-operator/driver, and subsequently began to serve as a dispatcher for American at its Allentown site. Ayer-

place served American's primary Allentown customer, Geo Specialty. Ayerplace was responsible for repairs to the tractor and American's trailer. Ayerplace did not have its own customers, serving solely American's customers.

With regard to **insurance**, Decedent purchased occupational insurance through American. In order to drive for American, Decedent signed an agreement indicating his status as an independent contractor. American advised DeLuca to possess occupational accident insurance for anyone who drove on behalf of American. Ayerplace did not purchase insurance on Decedent. American deducted costs of insuring drivers from payments to Ayerplace, which, in turn, deducted those costs from Decedent.

With regard to **payment,** the WCJ found that Decedent received checks from Ayerplace, from which Ayerplace made payroll deductions and deductions for occupational insurance. American deducted fuel charges and costs of insuring drivers from payments to Ayerplace. American paid Ayerplace a lump sum for Decedent's trips, from which Ayerplace paid Decedent. Decedent negotiated his rate of pay with Ayerplace, not American. Ayerplace paid Decedent by mileage when he was not carrying a load. American never made any direct payments to Decedent. Ayerplace issued a 1099 and W–2 to Decedent.

With regard to **supervision and control,** the WCJ found responsibility belonged to both American and Ayerplace. While DeLuca/ Ayerplace assigned runs to Decedent, Ayerplace did not control how Decedent made deliveries, such as what routes to use, or direct him to comply with any rules. American had the ability to determine who would drive for it. Also, American had authority to reprimand and discipline Decedent and to advise him how to perform his job. American required compliance with its policies to remain an

American "qualified driver." American disqualified Decedent as a driver after the accident. This essentially terminated Decedent as a driver because it precluded Ayerplace from dispatching him for American customers, and Ayerplace had no customers of its own. The truck assigned to Decedent by Ayerplace had an American logo.

Decedent did not complete any paperwork for Ayerplace. Decedent submitted all paperwork regarding his qualifications to American or its affiliate MIA prior to becoming a driver. After he started driving, Decedent sent trip inspection forms, his drivers' logs and bills of lading to American. American produced and retained all compliance-related paperwork, and it performed checks on his background and driving history. American retained the placement application/ qualification packet completed for MIA. Decedent possessed his driver's logbook with American's logo, American's 2007 fuel user's guide, American-issued fuel credit card, and a copy of American's policies at the time of the accident.

The WCJ found American and Ayerplace jointly liable as joint employers since Decedent furthered the interests of both Ayerplace and American at the time of injury. F.F. No. 27. She noted that both Gress and DeLuca deemed DeLuca an agent of American, and DeLuca assigned the load to Decedent. F.F. No. 25. DeLuca testified he considered American "his boss." F.F. No. 8.

In finding Ayerplace a joint employer, the WCJ attributed significance to the fact that DeLuca assigned the tractor-trailer to Decedent and directed Decedent to M & M for repairs that day. The WCJ also found

significant that DeLuca agreed in the Independent Business Associate Contract that all drivers are his employees. Based on that contract, the WCJ did not credit DeLuca's testimony in which he denied an employment relationship. She noted DeLuca wore two hats, one as owner of the tractor assigned to Decedent, and one as dispatch agent for American.

The WCJ rejected the testimony of Gress to the extent it could be construed as denying an employment relationship between Decedent and American. Specifically, the WCJ rejected Gress' testimony because Decedent had a copy of American's policies, American-issued log books and an American-issued fuel card, and it conflicted with Holmes' testimony.

The WCJ accepted Holmes' testimony as credible and persuasive regarding American's role in securing drivers dispatched by Ayerplace. The WCJ found Holmes ensured the drivers' training met American's standards and corrected drivers if they did not perform their duties in an acceptable manner. The WCJ determined that MIA[5] "did the hiring." The WCJ also found "[American] created the delivery schedule communicated to [Decedent] through Ayerplace[,] and the agent, Ayerplace, dispatched [Decedent] to haul the loads of Geo Specialty, a customer of [American]." F.F. No. 25.

## 2. Board Opinion

American and Ayerplace both appealed to the Board, arguing they are not jointly liable, and that Decedent is an independent contractor. American also argued the WCJ did not apply the proper factors to find an employment relationship, in-

5. The WCJ found the corporate entities of American, MIA, and Patriarch are so interwoven "that their independence ... bore no relationship to the reality of their business operations. All ... worked in concert to hire drivers to haul [American] loads" for American's customers. F.F. No. 23.

cluding degree of control. American and Ayerplace asserted the WCJ erred in applying agency principles in assessing employment status and finding an agency relationship between them.

The Fund argued the WCJ erred as a matter of law in not concluding that American was the statutory employer/actual employer of Decedent due to American's greater control over Decedent. The Fund also asserted the WCJ erred in finding joint liability as Ayerplace is not Decedent's employer.

The Board reversed the WCJ's order as to joint employment and liability, holding joint and several liability is not consistent with the Act. The Board determined that American was Decedent's direct employer and that Ayerplace directed Decedent only as an agent of American. Thus, the Board reversed the grant of the claim and fatal claim petitions against Ayerplace and the Fund, holding American solely liable for Decedent's claims.

■ American filed a petition for review with this Court, docketed to No. 2419 C.D. 2010, disclaiming its employer status. Claimant filed a petition for review, docketed to No. 2428 C.D. 2010, seeking reinstatement of the WCJ's order finding American and Ayerplace jointly liable. Ayerplace and the Fund intervened. We consolidated the petitions [6] and designated Claimant as petitioner.

## II. Discussion

■ The Act is the sole and exclusive means of recovery against employers for all injuries arising out of accidents occurring within the course of employment.

Section 303 of the Act, 77 P.S. § 481(a). The exclusivity provision of the Act essentially "bars tort actions flowing from any work-related injury." *Kline v. Arden H. Verner Co.*, 503 Pa. 251, 256, 469 A.2d 158, 160 (1983). Independent contractors cannot recover benefits under the Act, making employment status critical. *Cox v. Caeti*, 444 Pa. 143, 279 A.2d 756 (1971).

In this case, there is no dispute that Decedent died as a result of work injuries that occurred on the job. The dispute surrounds whether Decedent became injured while in an employment relationship with either Ayerplace or American, or both, or whether Decedent was an independent contractor. Ayerplace and American assert that no employment relationship existed with Decedent. Rather, the potential employers contend Decedent is an independent contractor. By contrast, the Fund advocates that American was Decedent's sole employer. We evaluate whether an employment relationship exists between Decedent and American and/or Ayerplace based upon the facts found by the WCJ.

### A. Employment Status

■ Employment status is a critical threshold determination for liability. *Universal Am–Can v. Workers' Comp. Appeal Bd. (Minteer)*, 563 Pa. 480, 762 A.2d 328 (2000) (finding owner-operator of tractor is an independent contractor). A claimant must prove an employment relationship in order to receive benefits. *Id.* The existence of an employer-employee relationship is a question of law based on the facts presented in each case. *3D Trucking v.*

6. This Court's review is limited to whether there was a violation of constitutional rights or error of law, and whether necessary findings of fact were supported by substantial evidence. *Hershgordon v. Workers' Comp. Appeal Bd. (Pepboys)*, 14 A.3d 922 (Pa.Cmwlth.

2011). To the extent this appeal presents questions of law, review in this matter is plenary. *Universal Am–Can v. Workers' Comp. Appeal Bd. (Minteer)*, 563 Pa. 480, 762 A.2d 328 (2000).

*Workers' Comp. Appeal Bd.(Fine and Anthony Holdings International)*, 921 A.2d 1281 (Pa.Cmwlth.2007) (affirming Board opinion holding affiliated trucking-related companies jointly liable for driver's single injury).

▪ With regard to whether a claimant is an independent contractor, courts consider many factors: (1) control of manner the work is done; (2) responsibility for result only; (3) terms of agreement between the parties; (4) nature of the work/occupation; (5) skill required for performance; (6) whether one is engaged in a distinct occupation or business; (7) which party supplies the tools/equipment; (8) whether payment is by time or by the job; (9) whether work is part of the regular business of employer; and, (10) the right to terminate employment. *Baum v. Workers' Comp. Appeal Bd. (Hitchcock)*, 721 A.2d 402 (Pa.Cmwlth.1998) (citing *Hammermill Paper v. Rust Eng'g Co.*, 430 Pa. 365, 243 A.2d 389 (1968); the relevant criteria are control of the manner of the work to be done, responsibility for the result, terms of agreement and nature of the occupation or business). None of these factors is dispositive. *Id.*

▪ The key factor is whether the alleged employer had the right to control the work to be done, and the manner in which work is performed. *Martin Trucking Co. v. Workmen's Comp. Appeal Bd.*, 30 Pa.Cmwlth. 367, 373 A.2d 1168 (1977). We find control in an employment relationship exists where the alleged employer: possesses the right to select the employee; the right and power to discharge the employee; the power to direct the manner of performance; and, the power to control the employee. *3D Trucking.* Payment of wages and payroll deductions are significant, as is provision of workers' compensation coverage. *Id.* However, payment is not determinative. *See Martin Trucking.*

Here, the WCJ found an employment relationship between Decedent and both American and Ayerplace. Based on the WCJ's findings, the Board found an employment relationship existed between Decedent and American only. Given the relationships among drivers, owner-operators and motor carriers, and the thorough regulation of them, the trucking industry presents unique challenges in determining employment status. *See Universal Am-Can.*

There are many Pennsylvania workers' compensation cases addressing employment status in the trucking industry. As these cases turn on the specific facts involved, the factual findings require in-depth scrutiny. We analyze the facts as they reflect the relationships between the alleged employers and between Decedent and each alleged employer below.

**1. Independent contractor status**

▪ Claimant bears the burden to demonstrate an employer-employee relationship. *Universal Am-Can.* However, our Supreme Court holds that "neither the compensation authorities nor the courts should be solicitous to find contractorship rather than employment, and that inferences favoring the claim need make only stronger appeal to reason than those opposed." *Diehl v. Keystone Alloys Co.*, 398 Pa. 56, 59, 156 A.2d 818, 820 (1959). Both the WCJ and the Board found Claimant met her burden of proof. We agree.

Truck drivers who direct their own routes, come and go as they see fit, and control their transport as owner-operators are often deemed independent contractors. *See, e.g., Universal Am-Can.* The Supreme Court reversed this Court's determination that a motor carrier employed an owner-operator, finding instead the driver was an independent contractor in *Univer-*

sal *Am–Can.* *See also Schneider Nat'l Carriers v. Workers' Comp. Appeal Bd. (Beardon)*, 738 A.2d 53 (Pa.Cmwlth.1999), *rev'd* (based on *Universal Am–Can* ) 567 Pa. 185, 786 A.2d 203 (2001).

In *Universal Am–Can,* this Court determined the factors indicated control by the carrier due to the carrier's control and supervision over the owner-operator/driver and the carrier's insignia upon a tractor-trailer. This Court placed particular emphasis upon the governance of the owner-operator by the carrier to assure compliance with federal and state regulations which provide that the carrier has exclusive possession, control and use of leased vehicles. Our Supreme Court held this Court erred in holding the regulation dispositive. Compliance with regulations is but one factor that may be considered when undertaking the common law analysis outlined in *Hammermill Paper.* The Supreme Court further held that we erred in holding that display of a logo on a truck creates an "irrebuttable presumption" of an employment relationship. *Universal Am–Can,* 563 Pa. at 488, 762 A.2d at 332.

The Supreme Court held this Court engaged in construing the carrier's regulatory compliance as reflecting control over claimant-owner-operator, when in reality, the carrier's actions reflected governmental control. The decision in *Universal Am–Can* thus cautions courts to separate government compliance from control when assessing the facts. The Supreme Court held that since all controls could be traced to the carrier's compliance, its control did not create an employment relationship.

We can easily distinguish this case from this Court's reversed decisions in *Universal Am–Can* and *Schneider Nat'l Carriers* because the facts reflect indicia of control beyond those mandated by regulation. Moreover, neither the WCJ nor the Board found that American's logo on the truck created an "irrebuttable presumption" of employment.

Unlike claimants in many truck driver cases, Decedent was not an owner-operator of the tractor involved. In contrast, he drove a tractor leased by Ayerplace from Patriarch Leasing—part of the American Network—and in turn leased back to American. Decedent only operated the tractor through American's authority as directed by Ayerplace. He had no control over his assignments.

Though Decedent signed an agreement stating he was an independent contractor to obtain occupational insurance, that is but one factor, and not determinative. *See Hiller v. Workmen's Comp. Appeal Bd. (Deberardinis)*, 131 Pa.Cmwlth. 189, 569 A.2d 1024 (1990). We agree with the Board's observation that the language in some of the documents was inconsistent with the manner in which the parties actually conducted their affairs. The facts reflect that Decedent did not engage in an independent trade or profession and could not control his time or manner of work. The record thus supports the Board's conclusion that Decedent was not an independent contractor as he had no right to control the work to be done or manner of performance.

### 2. Employer Identity–Joint and Several Liability

Claimant asserts the WCJ did not err in finding Ayerplace and American jointly liable under the workers' compensation scheme. The WCJ found that Ayerplace and American, two separate corporate entities, jointly employed Decedent to their mutual and joint benefit. The Board questioned whether joint liability has a place in the workers' compensation scheme, but it ultimately decided this case on its unique facts.

While rare, the concept of joint liability is not foreign to the workers' compensation scheme. Indeed, our courts have recognized the doctrine for decades. *See Hatter v. Lenox*, 206 Pa.Super. 263, 212 A.2d 916 (1965) (finding joint employment and liability between dentists given mutual benefits simultaneously received from claimant-secretary and joint contract governing her duties and performance). We deem the following cases assessing joint liability in the trucking industry instructive: *3D Trucking, Bifalco v. Workers' Comp. Appeal Bd. (Hafer)*, (Pa.Cmwlth. No. 450 C.D.2004, filed Sept. 1, 2004) (unreported opinion),[7] and *Red Line Express Co. v. Workmen's Comp. Appeal Bd. (Price)*, 138 Pa.Cmwlth. 375, 588 A.2d 90 (1991).

In *3D Trucking*, this Court recently upheld joint employment, and attendant joint liability, for related companies in the trucking industry. In *3D Trucking*, related companies ceased trucking operations and leased their trucks to 3D. Similar to this case, the claimant was a driver, not an owner-operator who leased his tractor to a carrier. However, the claimant in *3D Trucking* worked for affiliated trucking companies for a number of years and remained supervised by the same individual when 3D undertook operations. Further, 3D paid wages to the claimant, issued a W–2 tax form to him and obtained his insurance.

■ Unlike the scenario presented in *3D Trucking*, here Ayerplace serves as an agent to American assigned to run the Geo Specialty facility. Therefore, the assignments Ayerplace made and directives it issued to Decedent do not serve its inde-pendent interest. Ayerplace does not have its own customers. Once American disqualified Decedent, Ayerplace lacked the ability to make assignments to him. Thus, *3D Trucking* does not support a determination of joint employment by Ayerplace, an agent of American, **and** American, a motor carrier.

In *Bifalco*, this Court approved joint and several liability between an owner-operator and motor carrier as to a claimant-driver. The claimant truck-driver injured herself while making a delivery on behalf of both an owner-operator (Hafer Trucking) and motor carrier (Eastern GPS). Typical of a carrier, Eastern GPS owned the freight and directed delivery. We noted that while the claimant-driver completed an application for "Independent Contractor," she also completed employment-related documents. The claimant interviewed with the owner-operator, and it assigned the truck to her. Yet, the claimant called the carrier dispatcher daily to obtain pick-up and delivery instructions. The claimant believed both the carrier and owner-operator would penalize her if she did not make her pick-ups/deliveries.

In *Bifalco*, the carrier served as dispatcher for the claimant-driver, and knew and controlled the destinations. The owner-operator had hiring, firing and assignment authority. The claimant driver received payments from the owner-operator, paid based upon deliveries for the carrier. We thus determined there was joint liability.

While many similarities exist between *Bifalco* and this case, one crucial fact is notably absent from *Bifalco*, an agency relationship between the carrier and the

---

**7.** The Supreme Court granted allowance of appeal to consider "whether the Commonwealth Court erred in holding that joint and several liability can be appropriate under the workers' compensation liability scheme?" *Bifalco v. Workers' Comp. Appeal Bd. (Hafer)*, 583 Pa. 37, 874 A.2d 1145 (2005). However, the Court never reached a decision as the parties withdrew the case.

owner-operator. American designated Ayerplace its dispatcher in Allentown for Geo Specialty, and as American's agent, Ayerplace assigned trips to Decedent. F.F. No. 25. Ayerplace did not have independent authority to hire or fire Decedent or make assignments other than those under American's direction. F.F. No. 24.

In discerning joint control by the carrier and the owner-operator, the *Bifalco* Court heavily relied upon *Red Line*. *Red Line* involved a claimant-driver who had a contract with Princeton, an owner-operator, and reported to Red Line, the carrier. The WCJ found Red Line was the employer based on the following factors: (1) the lease agreement between Princeton and Red Line stated Princeton leased equipment to Red Line for its exclusive possession, use and sole responsibility; (2) claimant was required to call Red Line before pick-up and when she completed delivery; (3) Red Line could veto any trip leases the claimant driver received from other carriers; and, (4) Red Line set forth rules and regulations and required completion of paperwork, including trip reports and delivery receipts, to get paid.

The *Red Line* Court emphasized that the lease between the parties required Princeton to pay workers' compensation insurance and that Princeton retained the right to the fire the driver or transfer her to another truck. Further, Red Line could not control claimant-driver's manner of work, including what routes or hours of work. Given the indicia of control by Princeton over the driver, this Court determined an employment relationship existed, and we remanded to the referee to reinstate the petition against Princeton.

Nevertheless, the cases discussed above did not examine the broader policy implications of joint liability applied in the workers' compensation realm. Nor did we undertake an examination of the structure of the entire Act and how it treats the employer/employee relationship. Therefore, we cannot say that any of the cases definitively establish whether joint liability was intended by the framers of the Act.

After careful review, we conclude the facts here do not establish joint employment; rather, the indicia of control suggest the carrier, American, was Decedent's employer. We must discount the controls placed on a carrier by regulation. *Universal Am–Can*. Nonetheless, we believe *Martin Trucking* is particularly useful to our analysis.

In *Martin Trucking* the parties asked, "[W]hen the owner of a truck leases it to another and supplies the driver, is the driver an employee of the lessor [owner-operator] or of the lessee [carrier]?" *Martin Trucking*, 373 A.2d at 1168. In answer, this Court determined an employment relationship existed between a driver and a carrier due to the degree of control the carrier exercised over the driver. Specifically, we noted the carrier specified the routes for the trucks, and it posted bond and assigned drivers to make a specific pick-up.

Also, like the current case, the carrier in *Martin Trucking* did not pay the claimant-driver directly; instead, it paid the owner-operator by the load, from which the owner-operator paid the claimant. Payment of a driver by a lessor based on number and value of deliveries is a significant factor to show the lessor was the employer. *Red Line*. The carrier made payroll deductions for the claimant from its payment to the owner-operator. We concluded the carrier exercised sufficient control by directing the driver, controlling performance, work-schedule, trips/terminals, and giving daily instructions.

Applying the case law to the facts of this case, we uphold the Board's determination

that American is Decedent's employer. There is no dispute that American is the carrier and governed by federal motor carrier regulations. There is also no dispute that Ayerplace served as agent of American as of the date of injury, and exclusively services American's customers as it has none of its own. F.F. Nos. 8, 24. In other words, the functions that Ayerplace performs as dispatcher coordinating Decedent's activities benefited American and its customers.

We place particular emphasis on an entity's ability to hire, fire, discipline and set standards for Decedent's conduct. The record is clear that MIA did the hiring and collected the application packet for drivers. F.F. Nos. 23, 24. As in *3D Trucking*, there is sufficient affiliation to deem MIA essentially the staffing division of American.

Moreover, Holmes, of American, selected and trained drivers, and he ensured their compliance with American's policies. F.F. No. 11. American's policies exceed the government criteria for drivers, and American disqualifies, or essentially terminates, drivers who do not meet American's standards. *Id.* Ayerplace had none of its own policies to enforce, and received no paperwork from Decedent showing the work he performed and how he performed it. F.F. No. 8. American received and maintained all employment paperwork, and ultimately determined Decedent's day-to-day schedule through its agent, Ayerplace. F.F. No. 25.

Additionally, the record reflects that Decedent did not perform work to further the interests of Ayerplace, except to the extent that Ayerplace's interests coincided with those of American due to its agent status. *See Williams v. Workmen's Compensation Appeal Bd. (Global Van Lines)*, 682 A.2d 23 (Pa.Cmwlth.1996). The "borrowed employee" doctrine does not control because it is predicated upon an employment relationship existing between the lending employer and the claimant. *JFC Temps, Inc. v. Workmen's Comp. Appeal Bd. (G & B Packing)*, 545 Pa. 149, 680 A.2d 862 (1996). Here, we agree with the Board that substantial evidence supports a determination that American is Decedent's employer. We therefore affirm the Board's order holding American solely liable for Decedent's injuries.

## B. Statutory employer

For purposes of argument only, the Board advised the parties that, even were Ayerplace considered an employer, American remains the financially responsible party as the statutory employer. As the Board discussed statutory employer in the alternative, not as its primary ruling, we address it briefly here.

■ The purpose of the statutory employer doctrine is to place responsibility for payment on the first entity in a contractor chain when an injured employee's direct employer, the subcontractor, fails to secure workers' compensation insurance. *Six L's Packing Co. v. Workers' Comp. Appeal Bd. (Williamson)*, 2 A.3d 1268, 1272 (Pa.Cmwlth.2010), *appeal granted*, —— Pa. ——, 24 A.3d 859 (2011). The subcontractor is the direct employer in these scenarios. *Vandervort v. Workers' Comp. Appeal Bd. (City of Phila.)*, 899 A.2d 414 (Pa.Cmwlth.2006).

The Board concluded that the facts support a contractor/ subcontractor relationship between American and Ayerplace fitting for statutory employment. We respectfully disagree. American cannot be the direct employer and statutory employer simultaneously. For the Board to so conclude is inherently inconsistent with and undermines its principle holding that American is Decedent's sole direct employer. As the Board's legal error does

not alter the result, however, we need not reverse.

As the record offers sufficient evidence to support an employment relationship between American and Decedent, and does not support a relationship with Ayerplace, for the reasons set forth above, we affirm the Board's Order.

Judge McCULLOUGH did not participate in the decision in this case.

### ORDER

**AND NOW,** this 23rd day of February, 2012, the Opinion and Order of the Workers' Compensation Appeal Board dated October 13, 2010, at Nos. A09–1321 and A09–1301/A09–1302, is **AFFIRMED.**