# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ruggieri Enterprises, LLC d/b/a          :
Spherion, Zurich American Insurance      :
Company, and Gallagher Bassett           :
Services,                                :
                  Petitioners          :
                                  :
        v.                    :   No. 297 C.D. 2021
                                  :
Kale Teudhope (Workers'                  :
Compensation Appeal Board),              :
                  Respondent           :   Submitted:  March 18, 2022

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE ELLEN CEISLER, Judge
                 HONORABLE STACY WALLACE, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE CEISLER                 FILED: September 19, 2022

Ruggieri Enterprises, LLC d/b/a Spherion, Zurich American Insurance Company, and Gallagher Bassett Services (collectively, Spherion) petition this Court for review of the February 18, 2021, Order of the Workers' Compensation Appeal Board (Board), which affirmed an order by a Workers' Compensation Judge (WCJ) denying Spherion's Review and Joinder Petitions (collectively, Petitions). Through the Petitions, Spherion, a staffing agency, sought to relieve itself of liability for workers' compensation benefits it paid for a work injury sustained by its former employee, Kale Teudhope (Claimant). Spherion argues that Intervenors, Streuber Transportation, Inc. and its insurer (collectively, Streuber), are liable for Claimant's workers' compensation benefits, because Streuber was Claimant's employer at the time Claimant was injured. After careful review, we affirm.

## I. Background

On April 28, 2018, Claimant was severely injured in a fall while working at a furniture warehouse owned and operated by Streuber. Certified Record (C.R.), Item No. 15, WCJ Decision, Findings of Fact (F.F.) No. 5. Spherion first assigned Claimant to Streuber's warehouse from November 14, 2017 until December 29, 2017, when it assigned him to a different client. *Id.* Claimant returned to Streuber on February 23, 2018, and worked there until he sustained his work injury on April 28, 2018. *Id.* Spherion accepted liability for the work injury through issuance of a Notice of Compensation Payable (NCP), pursuant to the Workers' Compensation Act (Act).[1] C.R., Item No. 40.

On October 2, 2019, Spherion filed a Petition to Review Compensation Benefits (Review Petition), alleging that the NCP was materially incorrect and that Claimant was not a Spherion employee at the time of his work injury. C.R., Item No. 9. Spherion also filed a Petition for Joinder of Additional Defendant (Joinder Petition), seeking to add Streuber as an additional employer.[2] C.R., Item No. 12. Streuber denied the allegations. C.R., Items Nos. 11, 14.

In support of its Petitions, Spherion presented the live testimony of Amy Decker, its staffing specialist, and Bryan Chaffee, its business manager. In response,

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1-1041.4, 2501-2710.

[2] Spherion had previously filed a joinder petition naming the John V. Schultz Company (Schultz) as an additional employer. C.R., Item No. 4. Schultz is an Erie, Pennsylvania-based furniture retailer under common ownership with Streuber. F.F. No. 10. Additionally, Spherion had filed a review petition that did not name an additional employer. C.R., Item No. 2. Before the WCJ reached her decision, the parties stipulated that Streuber was the only properly named defendant. F.F. No. 12. The WCJ dismissed the earlier two petitions on that basis. *Id.*

The record contains numerous references to Schultz, and some witnesses refer to the two companies interchangeably. For the sake of clarity, we refer here only to Streuber whenever possible.

Streuber presented the live testimony of Michael Hayes, its warehouse manager, Scott Perry, Claimant's immediate supervisor at Streuber's warehouse, and Hudson Harrison, Streuber's quality control specialist.[3]

## A. Spherion's Evidence

### 1. Amy Decker's Testimony

Amy Decker testified that her duties at Spherion included recruiting, interviewing, and screening candidates for its client companies. C.R., Item No. 20, Notes of Testimony (N.T.), 3/26/19, at 13. With regard to Spherion's relationship with Streuber, Ms. Decker recalled that she was tasked with hiring candidates for "light, industrial" work at a furniture warehouse. *Id.* at 14. If a Spherion employee assigned to Streuber did not perform adequately, Streuber was to notify Spherion directly. *Id.* at 17. Spherion, in turn, would reassign the employee to a different assignment. *Id.* at 17-18. Spherion also provided employees' paychecks, after verifying with Streuber the number of hours worked each pay period. *Id.* at 33. Once an employee had worked at the assignment for 450 hours, the client company had the option of hiring that employee. *Id.* at 74.

On November 14, 2017, Claimant first visited Spherion's office in search of work. *Id.* at 19. After Claimant completed a job application and related his work history, Ms. Decker advised Claimant that Spherion's workers' compensation policy required all work injuries to be reported to Spherion. Claimant signed Spherion's employment policies, one of which required Claimant to acknowledge that he was a

---

[3] Another witness called by Streuber was Matthew Schultz, a co-owner of both Streuber and Schultz. C.R., Item No. 22, Notes of Testimony (N.T.), 10/1/19, at 6. In his testimony, Mr. Schultz described the relationship between the two companies and explained that, although they were under common ownership, Schultz was not responsible for management of Streuber's warehouse. *Id.* at 14-32. As Spherion did not appeal the dismissal of the petition against Schultz, Mr. Schultz's testimony is not further summarized below.

Spherion employee, and that he would notify Spherion if he would be late or absent from his assignment, "or to address any employment issues." *Id.* at 55-56. In Paragraph 15 of Spherion's employment policies Claimant acknowledged that he was "employed by Spherion and not a client to which [he might] be assigned and [Claimant was] not eligible to participate in any client profit-sharing, pension, welfare benefit, bonus[,] or other compensation or benefit plan of a client made available to their client's direct employees." *Id.* at 58.

Ms. Decker testified that in April 2018, Streuber notified her that it was sufficiently impressed with Claimant's performance and inquired about hiring him. *Id.* at 75. Claimant completed the required 450 hours by April 23, 2018, the date Claimant sustained the work injury. *Id.* at 76.

## 2. Bryan Chaffee's Testimony

Bryan Chaffee testified that Spherion's relationship with Streuber began when he contacted Streuber during a series of sales calls to area businesses. C.R., Item No. 21, N.T., 5/14/19, at 10. During contract negotiations between the two companies, Mr. Chaffee performed a site inspection of the Streuber warehouse. *Id.* at 12. He noted during inspection that Spherion would not permit its employees to operate neither the box trucks used by Streuber to make home deliveries, nor the warehouse's powered industrial trucks (PITs). *Id.* at 14. As part of these contract negotiations with Streuber, Mr. Chaffee also required that Streuber seek his approval, in writing, before changing an employee's work position. *Id.* at 16. Mr. Chaffee also agreed that the use of any equipment by an employee of his company required his authorization. *Id.* at 45. In addition, Spherion's permission was required before any of its employees worked in certain circumstances, including more than three feet above floor level. *Id.* at 45-47.

4

During his first stint at Streuber in November and December of 2017, Claimant worked as a materials handler, which primarily entailed the unloading of incoming delivery trucks. *Id.* at 13, 20. On February 20, 2018, a Streuber manager requested Claimant's return to the warehouse. *Id.* at 20. Spherion initially denied the request, since Claimant had been assigned to a different company, but Spherion assigned him to Streuber when that job ended. *Id.* at 21.

Upon Claimant's return, a Streuber manager asked Mr. Chaffee about the prospect of Claimant using PITs. *Id.* Mr. Chaffee responded that Spherion would allow its employees to use such equipment, but that any use of scissor lifts required proper training and the use of a safety harness. *Id.* at 21. He attached a packet of Spherion training materials in his reply, including "a basic PIT test," stating, "I [am] sure you have similar material available as well." *Id.* at 59. Mr. Chaffee received no confirmation from Streuber that Claimant had completed training for the position, nor did he ask Streuber whether Claimant had completed any. *Id.* at 83. Mr. Chaffee said that he was unaware that Claimant had actually changed his work duties until reviewing video footage from the warehouse on the date of the work injury. *Id.* at 84.

Mr. Chaffee acknowledged that, for several months following Claimant's injury, Spherion continued assigning its employees to Streuber. *Id.* at 62. Mr. Chaffee acknowledged difficulty in keeping those assignments filled, but explained that Spherion could not pull employees on other assignments to place them at Streuber, if asked to do so. *Id.* Mr. Chaffee also recalled a renewed discussion with Streuber management about the job duties of its temporary workers in November 2018. *Id.* at 69. As part of that discussion, Mr. Chaffee declined Streuber's request to allow Spherion employees to lift more than 100 pounds. *Id.* at 70-71. Mr. Chaffee

5

also acknowledged that he specified, in writing, that no Spherion employees would be permitted to work more than six feet off the ground.[4] *Id.* at 71.

## B. Streuber's Evidence

## 1. Michael Hayes' Testimony

Michael Hayes described the various job functions of workers in the Streuber warehouse. C.R., Item No. 20, N.T., 3/26/19, at 82. When furniture deliveries arrive at the facility, "receiving handlers" unload the trucks. *Id.* at 82-83. "Delivery prep handlers," on the other hand, prepare trucks for outgoing deliveries to retail customers. *Id.* "Pickers" use a forklift-like vehicle to either stock or remove freight from shelves located throughout the warehouse. *Id.* at 85-86. Mr. Hayes clarified that "picker" is not a distinct job title, but a way of referring to handlers who have been trained to operate the necessary equipment. *Id.* at 83, 102.

When Claimant began his first assignment at Streuber in November 2018, Mr. Hayes recalled that he worked in a sort of "hybrid" position, helping as a receiver in the morning and with delivery prep in the afternoon. *Id.* at 91-92. Mr. Hayes ensured that Claimant's duties remained within the bounds prescribed by Bryan Chaffee during his walk-through inspection. *Id.* at 85. To conform to Mr. Chaffee's instructions, Claimant was permitted to help unload trucks and prepare outgoing deliveries, but not to operate the picker equipment. *Id.* at 84. Mr. Chaffee explained to Mr. Hayes that Streuber would need to pay Spherion a higher rate for workers handling that equipment because Spherion had its own insurance criteria. *Id.* at 86.

---

[4] Mr. Chaffee was referring to an e-mail message dated November 14, 2018, and addressed to a Streuber manager, in which Mr. Chaffee states: "As we discussed: We had an injury, and Spherion employees can NEVER operate the scissor lift or be [six feet] or higher above the ground. This process can only occur once hired on." C.R., Item No. 33.

When Mr. Hayes requested Claimant's assignment to the warehouse in February 2018, Mr. Hayes was aware that Spherion employees had previously been forbidden to operate picking equipment. *Id.* at 94. He therefore "requested permission to train [Claimant] as a picker."[5] *Id.* at 93. After Mr. Hayes received Mr. Chaffee's permission and Claimant returned to Streuber, Mr. Hayes immediately had him begin picker training. *Id.* at 94. Mr. Hayes acknowledged that he received training materials from Mr. Chaffee but explained that Streuber trained Claimant with materials supplied by Crown, the equipment manufacturer, consistent with Streuber's training of its own employees. *Id.* at 105, 118.

In Mr. Hayes' view, Claimant did not perform job duties that were not expressly approved by Mr. Chaffee, and each of Claimant's duties was either demonstrated or explained during Mr. Chaffee's walk-through inspection. *Id.* at 87.

Mr. Hayes acknowledged that Streuber had been cited by the federal Occupational Safety and Health Administration (OSHA) following Claimant's injury.[6] *Id.* at 114. Mr. Hayes did not invite Mr. Chaffee or another Spherion

---

[5] Although Mr. Chaffee's reply is discussed above, the original e-mail message from Streuber requesting Claimant's services is not contained in the certified record.

[6] On May 1, 2018, in response to Claimant's work injury, officials from the federal Occupational Safety and Health Administration (OSHA) performed an inspection of the Streuber warehouse. C.R., Item No. 30, OSHA Inspection Report. The Report stated that "the extent of responsibility under the law for staffing agencies and host employers is dependent on the specific facts of each case," but also that "staffing agencies and host employers are **jointly responsible** for maintaining a safe work environment for temporary workers." *Id.* (emphasis in original).

Inspectors concluded that Streuber had committed two workplace safety violations. *Id.* The first was Streuber's failure to ensure that anyone working on a walking surface with an unprotected edge located more than four feet above a lower level was protected from falling by guardrail systems, safety net systems, or personal fall arrest systems, pursuant to 29 C.F.R. § 1910.28(b)(1)(i). *Id.* The second was the failure to train workers using personal fall protection systems in "procedures to minimize/recognize fall hazards and the correct installation, donning, inspection, and use" of those systems, pursuant to 29 C.F.R. § 191.30(a)(3). A fine of $11,641.00
**(Footnote continued on next page…)**

7

representative to take part in the investigation; only Mr. Hayes and representatives of Streuber met with OSHA officials. *Id.* at 117.

## 2. Scott Perry's Testimony

At the time of Claimant's injury, Scott Perry was serving as Streuber's delivery prep manager. C.R., Item No. 21, N.T., 5/14/19, at 92. Mr. Perry explained some of Claimant's day-to-day duties and the equipment he used. During his first assignment at Streuber, Claimant performed general handling duties for both the receiving and delivery prep areas, for which the only necessary tool was a box cutter. *Id.* at 123. Streuber expected workers to bring in box cutters but made some available on loan if the workers forgot their own. *Id.* at 123-24. Some of the job functions in which Claimant assisted ordinarily required driving a Streuber vehicle, but Claimant "couldn't get certified because he was a temp." *Id.* at 96.

Mr. Perry reiterated that when Claimant assumed picking duties upon his return to Streuber, his job description and pay rate remained the same. The only change was the equipment that Claimant was permitted to use after receiving his certification from Mr. Hayes. *Id.* at 106. Mr. Perry indicated that the forklift type vehicle used for picking is a type of "PIT machinery." *Id.* at 107. He also explained that workers engaged in picking duties wore a safety harness, which attaches to the body via a lanyard. *Id.* at 111-12.

## 3. Hudson Harrison's Testimony

Hudson Harrison testified that he was the Streuber employee primarily responsible for onboarding and training new workers. C.R., Item No. 21, 5/14/19 N.T. at 135. Mr. Harrison also accompanied Mr. Chaffee on his walk-through inspection in November 2017. *Id.* at 144. After visiting the receiving and prep

---

was initially assessed against Streuber, which was later reduced to $8,150.00. C.R., Item No. 39, Streuber OSHA Payment.

departments, Mr. Harrison took Mr. Chaffee through the racking area, where the furniture is shelved and unshelved by workers using picking equipment. *Id.* at 145. In each area of the warehouse, Mr. Harrison explained or demonstrated the relevant job functions of each position. *Id.* at 146. Mr. Harrison testified that Mr. Chaffee did not lodge objections to any of the specific job functions during the tour. *Id.*

Mr. Harrison recalled a second meeting with Mr. Chaffee in February 2018, at which he, another Streuber manager, and Mr. Chaffee discussed Streuber's need for additional weekend staff. *Id.* at 149. At that time, Mr. Harrison explained the training process for pickers. *Id.* at 150. Thereafter, Claimant's second assignment to Streuber began, during which Claimant completed the picker training under Mr. Harrison's guidance, which consisted of training videos and hands-on lessons using the equipment itself. *Id.* at 153-54. Claimant was also taught how to employ the safety harnesses required to be worn while picking. *Id.* Finally, Claimant was required to complete a written comprehension test, for which he received a perfect score. *Id.* at 160.

## C. The WCJ's Decision

In a February 11, 2020 decision, the WCJ denied Spherion's Petitions as to Streuber. The WCJ concluded that Spherion had not established facts that were unavailable to it when the NCP was issued and, therefore, failed to demonstrate that the NCP was materially incorrect. WCJ Decision, Conclusions of Law (C.L.) No. 3.[7] The WCJ deemed the testimony of all witnesses to be "generally credible" in light of the following factual findings. Spherion hired Claimant, placed him at Streuber, and signed his paychecks. Spherion specifically advised Claimant that

---

[7] As noted above, the WCJ also dismissed Spherion's previous two petitions, since "[d]uring the pendency of these petitions . . . the parties acknowledged that the proper additional defendant was Streuber, not John V. Schultz." F.F. No. 12.

9

Spherion was his employer. Spherion specified the job duties which its employees were authorized to do pursuant to its contract with Spherion. Additionally, Spherion mandated its prior approval to any changes in Claimant's job duties. And finally, Spherion sent Claimant notices regarding his workers' compensation coverage. F.F. No. 13(a)-(l). The WCJ concluded, "[t]he only thing that actually transferred to Streuber was the day[-]to[-]day oversight of Claimant that is necessary in all temporary employment situations." F.F. Nos. 13 and 14.

Spherion appealed to the Board, which affirmed the WCJ in a February 18, 2021 decision. This appeal followed.

## II. Issues

In its appeal to this Court,[8] Spherion argues that the WCJ's decision was capricious, not reasoned, and unsupported by substantial evidence; that the WCJ failed to apply the relevant case law with regard to either the Review or Joinder Petition; and that the Board had consequently erred in affirming her decision.

## III. Discussion

## A. The Review Petition

An NCP that contains a mistake as to the identity of an employer may be subject to correction, provided that the alleged material mistake was made at the time that the NCP was issued. *Mahon v. Workers' Comp. Appeal Bd. (Expert Window Cleaning and State Workers' Ins. Fund)*, 835 A.2d 420, 427 (Pa. Cmwlth. 2003), *appeal denied*, 849 A.2d 1206 (Pa. 2004). The party seeking to modify the NCP carries the burden of proving such a mistake. *ESAB Welding & Cutting Prods.*

---

[8] The standard of appellate review in a workers' compensation proceeding is limited to determining whether constitutional rights were violated, whether an error of law was committed, and whether the findings of fact are supported by substantial evidence. *Gumro v. Workmen's Comp. Appeal Bd. (Emerald Mines Corp.)*, 626 A.2d 94, 97 (Pa. 1993).

10

*v. Workers' Comp. Appeal Bd. (Wallen)*, 978 A.2d 399, 404 (Pa. Cmwlth. 2009), *appeal denied*, 991 A.2d 314 (Pa. 2010). Instantly, Spherion maintains that it committed a material mistake of fact when it issued an NCP stating that it was Claimant's employer. Spherion alleges that the WCJ improperly denied its Review Petition, which would amend the NCP to make Streuber the employer liable for Claimant's workers' compensation benefits.

It is well settled that when an employee of one company is loaned to another, the primary factors in determining employer status are the control over the work to be completed and the manner in which it is to be performed. *Universal Am-Can, Ltd. v. Workers' Comp. Appeal Bd. (Minteer)*, 762 A.2d 328, 333 (Pa. 2000). Other relevant factors include responsibility for the results of the work; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one is engaged in a distinct occupation or business; which party supplied the tools; whether payment is by the time or by the job; whether the work is part of the employer's regular business; and the right to terminate the employment. *Id.* (citing *Hammermill Paper Co. v. Rust Eng'g Co.*, 243 A.2d 389, 392 (Pa. 1968)). The provision of workers' compensation coverage is another important factor. *3D Trucking Co., Inc. v. Workers' Comp. Appeal Bd. (Fine and Anthony Holdings Int'l)*, 921 A.2d 1281, 1288 (Pa. Cmwlth. 2007). Although the determination of an employer-employee relationship is a question of law, it depends heavily on the WCJ's underlying credibility and factual determinations. *Berkebile Towing and Recovery v. Workers' Comp. Appeal Bd. (Harr, State Workers' Ins. Fund and Uninsured Employers' Guar. Fund)*, 254 A.3d 783, 793 (Pa. Cmwlth. 2021) (citing *Universal Am-Can*, 762 A.2d at 330-31).

In support of its contention that Streuber is the liable employer, Spherion cites *JFC Temps, Incorporated v. Workers' Compensation Appeal Board (Lindsay)* (*JFC Temps*), 680 A.2d 862 (Pa. 1996). In that case, JFC, a temporary employment agency, assigned the claimant to G & B Packing (G & B) as the driver of a tractor trailer. *Id.* at 864. The claimant reported daily to G & B, where an operations manager instructed him on his work hours, which truck to use, and his destinations, then gave him freight documents, the bill of lading, and the keys to a tractor-trailer. *Id.* No representative of JFC was ever present at the G & B work site. *Id.* Yet JFC determined and paid the claimant's salary (based on time slips completed and signed by G & B personnel). *Id.* If the claimant could not work, JFC would supply a replacement. *Id.* Whether the claimant's work was satisfactory was G & B's decision; if not, G & B could request a replacement from JFC. *Id.* JFC personnel was never present at the G & B work site and gave the claimant no instructions regarding his work performance. *Id.* at 866. G & B controlled the day-to-day operations of its vehicles and held the right to select the routes taken by the claimant. *Id.* Moreover, no contract existed between JFC and G & B. *Id.* Since G & B had the right to control the manner of the claimant's work performance, our Supreme Court affirmed the Board's conclusion that G & B, not JFC, was the liable employer. *Id.*

Spherion argues that *JFC Temps* supports its position because Streuber, like G & B, held the right to control Claimant "with regard to not only the work performed but also as to the manner of performing it." Spherion's Brief (Br.) at 36. Spherion asserts that the contract between the two companies provided that Streuber would "control the details of the work" and "be responsible for the work product" of temporary employees. *Id.* at 39 (citing C.R., Item No. 25, Staffing and

12

Professional Contract Services Agreement, ¶ 2). Spherion also refers to record evidence that Streuber had requested Claimant's return before his second assignment at the warehouse; that Streuber had provided Spherion with a detailed job description, which delineated Claimant's job duties; and that Claimant was trained and supervised by Mr. Harrison, a Streuber manager. Spherion adds that Mr. Chaffee, its representative, was never invited to attend any of Claimant's training, nor did he receive a response to his request for documentation before Claimant's position could be changed.

We find *JFC Temps* to be readily distinguishable from the instant matter. As noted above, JFC was "never present" at the G & B work site. *JFC Temps*, 680 A.2d at 865. By contrast, Spherion's representative was present at the Streuber work site on multiple occasions, and even toured the warehouse in order to give his approval or disapproval to the tasks that his company's employees would be performing. While the contract between Spherion and Streuber does contain language granting provisional control to Streuber over Claimant's work, it also imposes numerous restrictions on his tasks, as well as the prohibition on any change in his job duties or job location without Spherion's permission. While Streuber specifically requested that Claimant be assigned to its warehouse in February 2018 (unlike G & B Packing, which expressed no preference for a specific JFC employee), Spherion denied the request because Claimant was assigned to another client at the time. These factors underscore Spherion's right to control Claimant's work assignments.

Spherion argues that even if it officially held control over Claimant's work, Streuber "abrogated [Spherion] of those same control rights when it placed Claimant in the [p]icker without following through with the final steps to get prior written approval and without advising [Spherion] on any date before the accident that [it]

13

had already moved Claimant to the [p]icker position." Spherion's Br. at 29. We are not persuaded by Spherion's argument. Mr. Chaffee's February 20, 2018 e-mail authorized Claimant's use of Streuber's picking equipment. C.R., Item No. 33. Mr. Chaffee indicated that proper training and the use of safety harnesses were required only with the use of a scissor lift, which Claimant never used. Mr. Chaffee remarked that Streuber likely had training materials similar to those provided by Spherion, which indicates that Streuber had a choice of using the training materials furnished by Mr. Chaffee or its own. Furthermore, when Mr. Chaffee visited the Streuber warehouse in February 2018, he received a demonstration of the picker training that Streuber would provide. Spherion's concession to Streuber's training methods does not demonstrate that Claimant's duties exceeded those authorized by Spherion or that Spherion no longer exercised control over Claimant's work assignments.

Other evidence in the record reinforces the conclusion that Spherion maintained control over the manner of Claimant's work performance at the time of his injury. Like all Spherion employees, Claimant was required to follow its rules of conduct while on assignment, and was forbidden by Spherion to participate in a client's benefit program. As noted previously, Spherion held workers' compensation insurance for its employees. Claimant was informed of Spherion's workers' compensation policy on the day Claimant was hired, before receiving his assignment to Streuber.

Spherion also argues that the OSHA Inspection Report constitutes proof that Streuber "usurped authority and control" of Claimant by placing him in "an unauthorized position." Spherion's Br. at 30. We disagree. It is true that the OSHA official who issued the Report advised Streuber that "staffing agencies are *jointly responsible* with host companies for the safety of temporary workers." C.R., Item

14

No. 30 (emphasis in original). However, OSHA's central concern was the safety of the Streuber warehouse as a workplace. That is substantially different from the question of whether control had passed from agency to host company, such that the latter became the liable employer for workers' compensation purposes. As the same OSHA official observed, "the extent of responsibility under the law" for each of the companies was not an issue that the Report was designed to address.

### B. The Joinder Petition

A party desiring to join another defendant to assert a claim relevant to the pending petition may do so as a matter of right by filing a petition for joinder. 34 Pa. Code § 131.36. A WCJ is authorized to treat a joinder petition as a new claim petition filed on behalf of a claimant against a putative employer. *3D Trucking Co., Inc.*, 921 A.2d at 1287. Regarding its Joinder Petition, Spherion maintains that the facts of this case warrant "a determination as to whether joint or shared liability should have been imposed between [Spherion] and Streuber, rather than only one or the other." Spherion's Br. at 58-59.

In support, Spherion cites a line of workers' compensation cases from the trucking industry, where resolution of the employment question is sometimes elusive. For example, in *American Road Lines v. Workers' Compensation Appeal Board (Royal)*, 39 A.3d 603 (Pa. Cmwlth. 2012), the WCJ found that a deceased tractor-trailer driver was jointly employed by Ayerplace Enterprises, the contractor that owned the vehicle that he drove, and by American Road Lines, a motor carrier for whom Ayerplace provided dispatch and coordination services.[9] 39 A.3d at 608.

---

[9] The decedent in *American Road Lines* was nominally an independent contractor rather than an employee of either company. As we noted, this made employment status "critical, because independent contractors cannot recover benefits under the Act." *Id.* at 610.

The Board reversed in part, holding that "joint and several liability is not consistent with the Act." *Id.* at 610.

On appeal to this Court, we disagreed with the Board's determination of the joint liability question, observing that, "[w]hile rare, the concept . . . is not foreign to the workers' compensation scheme[; i]ndeed, our courts have recognized the doctrine for decades." *Id.* at 613. We affirmed on other grounds, however, holding that the record offered sufficient evidence that American Road Lines was the decedent's sole employer. *Id.* at 616. The contract between the two companies provided that American Road Lines would exercise no control of its own over the drivers. *Id.* at 607. Yet, we ruled out joint liability, since Ayerplace had no customers of its own, had no independent authority to hire or fire the decedent, and could not give him assignments other than those under American Road Lines' direction. *Id.* at 613-14. Ayerplace "had none of its own policies to enforce and received no paperwork from [the decedent] showing the work he performed and how he performed it." *Id.* at 615. We placed "particular emphasis on an entity's ability to hire, fire, discipline, and set standards for [the claimant's] conduct." *Id.* American Road Lines' ability to do each of those things was further confirmation that it was the sole employer. *Id.*

Spherion argues *American Road Lines* applies because "the manner in which the parties *actually conducted their affairs*" determined employer status, and not the agreement between the parties. Spherion's Br. at 60 (emphasis in original). As Spherion observes of *American Road Lines*, "the parties did not have a relationship or conduct themselves in a manner that provided [the decedent] with control over his time or manner of work, despite the language in the written contract." *Id.* at 61.

16

We disagree with Spherion's reliance on *American Road Lines* to support its assertion that Spherion shares liability with Streuber. The relationship between the two companies in that case was defined by the almost complete subordination of Ayerplace's interests to those of American Road Lines. By contrast, Spherion was free to pursue its own interests, which it did by exercising its firm control over Claimant's work and manner of performance. Spherion required that Claimant abide by its policies, determined which duties Claimant was authorized to perform, and, crucially, maintained the power to "hire, fire, discipline, and set standards for" Claimant's conduct. Insofar as Streuber assumed any authority over Claimant's daily activities, it remained carefully delineated within the agreement between the two companies. We therefore conclude that the WCJ and Board did not err when they declined to entertain the question of joint liability.

## IV. Conclusion

In light of the foregoing, we see no error in the WCJ's conclusion that Spherion was Claimant's sole employer at the time of his injury, and that Spherion's initial acceptance of liability for his workers' compensation payments was therefore not materially incorrect. Accordingly, we affirm the Board.

_____
ELLEN CEISLER, Judge

17

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Ruggieri Enterprises, LLC d/b/a    :
Spherion, Zurich American Insurance :
Company, and Gallagher Bassett    :
Services,                          :
             Petitioners     :
                              :
        v.                 : No. 297 C.D. 2021
                              :
Kale Teudhope (Workers'       :
Compensation Appeal Board),   :
             Respondent   :

**O R D E R**

AND NOW, this 19th day of September, 2022, the order of the Workers'
Compensation Appeal Board in the above-captioned matter, dated February 18,
2021, is hereby AFFIRMED.

                                 _____
                                 ELLEN CEISLER, Judge