IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Altoona Housing Authority,        :
                                Petitioner    :
                                           :
        v.                            :
                                           :
Garrett Beckenbaugh, Frank Winston  :
Crum Insurance Company, Inc., Kylor  :
Contracting LLC, State Workers'      :
Insurance Fund, and Uninsured        :
Employers Guaranty Fund (Workers'   :
Compensation Appeal Board),      : No. 856 C.D. 2024
                         Respondents  : Argued: May 7, 2025

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                  HONORABLE PATRICIA A. McCULLOUGH, Judge
                  HONORABLE ANNE E. COVEY, Judge
                  HONORABLE MICHAEL H. WOJCIK, Judge
                  HONORABLE CHRISTINE FIZZANO CANNON, Judge
                  HONORABLE STACY WALLACE, Judge
                  HONORABLE MATTHEW S. WOLF, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WALLACE                        FILED:  August 15, 2025

The Altoona Housing Authority (Housing Authority) petitions for review of the June 7, 2024 opinion and order (Order) of the Workers' Compensation Appeal Board (Board) that affirmed the Workers' Compensation Judge's (WCJ) decision (Decision) granting Garrett Beckenbaugh's (Claimant) claim petition against the

Housing Authority as Claimant's statutory employer under Section 302(a) of the Workers' Compensation Act (Act).[1]  After review, we affirm.

## BACKGROUND

In October 2018, Claimant filed a claim petition alleging he suffered a disabling injury on May 15, 2017, after falling off a roof at the Housing Authority's Fairview Hills Housing Development (Fairview Hills) while in the course and scope of his employment as a laborer for Kylor Contracting, LLC (Kylor).  Certified Record (C.R.) at 99.  In response, Kylor's insurer, Frank Winston Crum Insurance Company (FrankCrum Insurance) issued a Notice of Compensation Denial (NCD). *Id*. at 98.[2]

In January 2019, Claimant filed a claim petition for benefits from the Uninsured Employers Guaranty Fund (the Fund) alleging Kylor did not maintain workers' compensation insurance coverage.[3]  *Id*.  Kylor, FrankCrum Insurance, and

---

[1] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 461.

[2] At a hearing before the WCJ, FrankCrum Insurance's counsel explained that FrankCrum Insurance and Frank Crum are separate entities. *Id*. at 224.  Frank Crum is a Professional Employer Organization that leases employees to its client companies, including Kylor. *Id*. at 224.  According to the client services agreement between Frank Crum and Kylor, an individual is only considered an "employee" if the individual is approved by Frank Crum. *Id*.  Individuals who work for Kylor, but are not approved by Frank Crum, are considered direct hires of Kylor. *Id*.  Kylor's direct hires are not covered by FrankCrum Insurance. *Id*.  Because Frank Crum did not approve Claimant as an "employee," FrankCrum Insurance issued the NCD because Frank Crum was not Claimant's employer. *Id*.  at 225.

[3] Section 1602(c) of the Act, added by the Act of November 9, 2006, P.L. 262, provides:

> The administrator shall establish and maintain the fund for the exclusive purpose of paying to any claimant or his dependents workers' compensation benefits due and payable under this act and the act of June 21, 1939 (P.L. 566, No. 284), known as The Pennsylvania Occupational Disease Act, and any costs specifically associated therewith where the employer liable for the payments failed to insure or

**(Footnote continued on next page…)**

2

the Fund filed petitions to join the Housing Authority as an additional employer. Claimant also filed a claim petition against the Housing Authority. *Id*.

Before the WCJ, the parties stipulated Claimant "sustained a work injury on May 15, 2017, in the nature of . . . fractures [to his lumbar vertebrae, a] laceration to [his] chin, and paraplegia." *Id*. Additionally, the parties entered the Roof Replacement Agreement (Agreement) which stated the Housing Authority "maintains and is responsible for various housing and apartment complexes" and, in connection with the maintenance of such facilities, contracted with Kylor for the performance of roof replacement work. *Id*. at 708. Additionally, the parties submitted testimonial evidence, the relevant portions of which are as follows.

Claimant testified he worked for Kylor for approximately five years before his injury. *Id*. at 99. Claimant noted his hours varied by week, and he received his pay via a business check from Kylor. *Id*. Claimant explained that while working for Kylor, he received directions from Troy Kylor, an owner of Kylor, and Robert Beckenbaugh, his father and a foreman for Kylor. *Id*. at 98-99. Regarding the day of his injury, Claimant testified he was working for Kylor and shingling a roof at the Housing Authority's Fairview Hills project. *Id*. at 98. Claimant indicated he had completed an application for the Housing Authority, but he did not pass the background check. *Id*. at 99. Claimant stated before starting the job at the Housing Authority, Claimant, Troy Kylor, and Robert Beckenbaugh discussed whether he should be at the jobsite. *Id*. Claimant indicated he rode with Robert Beckenbaugh in a Kylor truck to the jobsite. *Id*. According to Claimant, Greg Stiteler, an inspector

---

self-insure its workers' compensation liability under section 305 at the time the injuries took place.

77 P.S. § 2702(c).

3

for the Housing Authority (Inspector), was aware Claimant was working on the project and told Troy Kylor and Robert Beckenbaugh to "blend" Claimant and another worker in. *Id*.

Troy Kylor testified he was an owner of, and employed by, Kylor. *Id*. at 103. He explained that "on paper" April Kylor owned Kylor, and he and Robert Beckenbaugh were project managers. *Id*. Troy Kylor explained he had supervisory responsibility for the crew, but claimed he did not have permanent employees. *Id*. Although he acknowledged that he directed and supervised the crew's work, told them when to report each day, and when their work day was done, he indicated all employees had their own license and insurance. *Id*. According to Troy Kylor, Robert Beckenbaugh was the supervisor on site at the Fairview Hills project, and Robert Beckenbaugh told him he was taking Claimant to the jobsite. *Id*. Regarding whether Claimant was an employee of Kylor, Troy Kylor indicated he "would not disagree" if April Kylor described Claimant as an employee because Robert Beckenbaugh brought Claimant with him and paid him. *Id*.

Robert Beckenbaugh testified he was employed by Kylor as a foreman, supervisor, and project manager. *Id*. at 104. He indicated he hired workers for Kylor and told workers when to show up for jobs. *Id*. Regarding the Fairview Hills project, Robert Beckenbaugh testified he was the foreman, and Inspector would stop by the jobsite, inspect Kylor's work, and ensure the work was being completed the way the Housing Authority requested. *Id*. at 105. Robert Beckenbaugh described that while on the site, Inspector went onto the roof and pointed out a piece of plywood that was facing the wrong direction, and they flipped it. *Id*. While Inspector was on the roof, Claimant was also working on the roof. *Id*. According to Robert Beckenbaugh, Inspector told Kylor that unapproved employees, including

4

Claimant, could work on the job because he was having trouble getting people approved, and Inspector was aware Claimant was not approved, but he was nonetheless going to be on the Fairview Hills project. *Id*.

Inspector testified he was the acting maintenance supervisor at the time of Claimant's injury, while James Stevens (Maintenance Director) was out of work on medical leave. *Id*. at 101. Inspector testified the Housing Authority is responsible for maintaining 535 housing units. *Id*. Additionally, Inspector testified the Housing Authority's Maintenance Department occasionally does some roof work, such as replacing shingles, repairing minor roof leaks, cleaning gutters, and patching roofs for the Housing Authority. *Id*. Inspector explained Kylor was working on the Fairview Hills project and Inspector watched to ensure Kylor was in compliance with the contract for the roof replacement. *Id*. Inspector explained he spoke with Troy Kylor and Robert Beckenbaugh about the work that needed done. *Id*. Inspector did not recall telling anyone to "blend in" nor did he recall Troy Kylor or Robert Beckenbaugh indicating there was someone working who was not supposed to be there. *Id*. He also did not recall having a conversation about Claimant not being permitted to work on the jobsite. *Id*.

Cheryl Johns, the Housing Authority's executive director (Director), testified the Housing Authority provides public housing and explained the Housing Authority is not "in the business of" construction. *Id*. at 338. The Director noted the Housing Authority generally outsources its roofing work, but acknowledged the Housing Authority is "ultimately responsible" for ensuring roofs are installed on the housing units, including the roof Claimant was working on the day he was injured. *Id*. at 382-83.

5

Finally, the Maintenance Director testified he was the contact person for contractors doing projects for the Housing Authority, and he checked on contractors daily by observing their work to ensure they completed tasks correctly. *Id*. at 104. He indicated he would spend one and one-half to two hours a day on site supervising a contractor. *Id*. at 748. Notably, the Maintenance Director testified that so long as the Housing Authority operates housing units, roof replacement projects will need to be done recurrently because of wear and tear. *Id*. When asked whether he does maintenance and repair work on roofs as part of his job in the Maintenance Department, he answered "Yes. Over the years, we replaced a lot of roofs." *Id*. at 736. Regarding the Fairview Hills project, the Maintenance Director indicated he was off work in May 2017 because he had surgery. *Id*. He explained Inspector fulfilled his Maintenance Director role while he was out, and it was, therefore, Inspector's responsibility to supervise Kylor and make sure the project was completed on schedule and as bid. *Id*.

After considering the evidence, the WCJ issued his Decision. In his Decision, the WCJ deemed Claimant's testimony credible and accepted that Claimant was told to "blend in" even though he was not approved to work on the Housing Authority's Fairview Hills project. *Id*. at 161. Additionally, the WCJ found Robert Beckenbaugh's testimony credible, specifically that Kylor employed Claimant, and Inspector observed Claimant on the roof. *Id*. The WCJ also noted he accepted Robert Beckenbaugh's testimony that Inspector pointed out a piece of plywood that was going the wrong way and directed Kylor to correct it. *Id*. Regarding Inspector, the WCJ accepted his testimony that the Housing Authority's employees repair leaks, replace shingles, and clean gutters. *Id*. The WCJ found Inspector was skilled in construction and maintenance and accepted Inspector's testimony that he directly

6

supervised Kylor's work. *Id*. Further, while the WCJ found Director credible, he noted her testimony did not rebut the premise that the Housing Authority was responsible to maintain sound roofs on its premises as a regular and recurrent part of its business or that the Housing Authority's personnel skilled in construction and maintenance directly supervised Kylor's roof work. *Id*. Finally, the WCJ accepted Maintenance Director's testimony as credible, specifically that roof replacement is a regular and recurrent part of the Housing Authority's business. *Id*. The WCJ found the Agreement indicated the Housing Authority "maintains and is responsible for various housing and apartment complexes" and, in connection with the maintenance of such facilities, contracted with Kylor for the performance of roof work. *Id*. at 106.

The WCJ found Claimant met his burden to establish by sufficient, competent, and credible evidence that he sustained a work injury and was entitled to workers' compensation benefits for temporary total disability benefits and payment of medical expenses. *Id*. at 107. Therefore, the WCJ granted Claimant's claim petition against Kylor. *Id*. Additionally, the WCJ found Claimant, Kylor, FrankCrum Insurance, and the Fund met their burden to establish the Housing Authority was Claimant's statutory employer under Section 302(a) of the Act. *Id*. at 106. Specifically, the WCJ noted: "Entities contracting others to perform work which is a regular or recurrent part of their business must assure that the employees of those others are covered by workers' compensation insurance, on pain of assuming secondary liability for benefits payment upon default." *Id*. at 107-08. Because the Housing Authority contracted with Kylor to perform work which is a regular or recurrent part of the Housing Authority's business, the WCJ concluded the Housing Authority was Claimant's statutory employer and granted the parties' petitions for joinder, as well

7

as Claimant's claim petition against the Housing Authority. *Id*. at 106. Having concluded the Housing Authority was Claimant's statutory employer, the WCJ dismissed Claimant's claim petition for benefits from the Fund. *Id*. at 108.

The Housing Authority appealed to the Board. The Board determined that based on the WCJ's credibility determinations, over which the WCJ had complete authority, Claimant established he sustained a work injury after falling from a roof, his employer on the date of his work injury was Kylor, and the Housing Authority was his statutory employer. *Id*. at 210. Regarding the Housing Authority as Claimant's statutory employer, the Board noted the WCJ credited the Agreement, as well as the testimony of Robert Beckenbaugh, the Director, and the Maintenance Director, which all indicated the Housing Authority contracted with Kylor to perform work which is a regular or recurrent part of the Housing Authority's business, such business being maintenance of its roofs. *Id*. at 209. In response to the Housing Authority's argument that it could not be Claimant's statutory employer because Claimant was not permitted to work on the project, the Board explained: "Whether Claimant was permitted on the job site does not affect the nature of [the Housing Authority's] business relationship to [Kylor] in relation to the project on which Claimant was injured, which is the relevant inquiry under Section 302(a) of the Act." *Id*. at 210. Accordingly, the Board issued its Order affirming the WCJ's Decision. *Id*. at 212.

The Housing Authority now appeals to this Court. On appeal, the Housing Authority's sole argument is that the Board erred by determining it was Claimant's statutory employer under Section 302(a) of the Act. Hous. Auth.'s Br. at 2. Specifically, the Housing Authority contends it should not be held liable as Claimant's statutory employer where Claimant knew he was not permitted to work

8

on the project on which he was injured. *Id*. at 10. In response, Claimant contends the Board properly concluded whether Claimant was permitted to work on the project on which he was injured was not relevant to the analysis under Section 302(a) of the Act. Claimant's Br. at 10. Likewise, the Fund asserts the Board "properly concluded that whether Claimant was permitted on the jobsite does not affect the fact that [the Housing Authority] subcontracted a regular or recurrent part of its business to [Kylor] which is the relevant inquiry under Section 302(a) of the Act." The Fund's Br. at 8. Similarly, FrankCrum Insurance argues the Housing Authority was in possession of the premises where Claimant was injured, roof replacement is a recurrent part of the Housing Authority's business, and, accordingly, the Housing Authority is Claimant's statutory employer under the Act. FrankCrum Ins.'s Br. at 6.

**DISCUSSION**

This Court reviews workers' compensation orders for violations of a party's constitutional rights, violations of agency practice and procedure, and other errors of law. 2 Pa.C.S. § 704. We also review whether substantial evidence supports the findings of fact necessary to sustain the Board's decision. *Id.* The WCJ is the ultimate fact finder in workers' compensation cases and is entitled to weigh the evidence and assess the credibility of witnesses. *Montano v. Advance Stores Co., Inc. (Workers' Comp. Appeal Bd.)*, 278 A.3d 969, 978 n.4 (Pa. Cmwlth. 2022) (citing *Sharkey v. Workers' Comp. Appeal Bd. (Fed. Express)*, 786 A.2d 1035, 1038 (Pa. Cmwlth. 2001)). In reviewing issues concerning the Act, we are mindful the Act is remedial in nature and its purpose is to benefit the workers of the Commonwealth. *Tooey v. AK Steel Corp.*, 81 A.3d 851, 858 (Pa. 2013). Accordingly, we construe the Act liberally to effectuate its humanitarian objectives, and we resolve borderline

9

interpretations in the injured party's favor. *Id.* (citation omitted). With this in mind, we address the Housing Authority's issue on appeal.

Under Section 302(a) of the Act, a contractor who subcontracts all or any part of a contract is liable for workers' compensation to the employees of the subcontractor in the event the subcontractor that is primarily liable has failed to secure coverage. 77 P.S. § 461. Section 302(a) of the Act further provides, in relevant part, that for purposes of this section, "a person who contracts with another . . . to have work performed of a kind which is a regular or recurrent part of the business . . . of such person shall be deemed a contractor, and such other person a subcontractor." *Id.* In this sense, general contractors have been denominated "statutory employers" for purposes of workers' compensation liability, although they are not common-law employers of subcontractor employees. *Patton v. Worthington Assocs., Inc.*, 89 A.3d 643, 645 (Pa. 2014) (citation omitted). This "statutory employer doctrine" serves to "place responsibility for payment on the first entity in a contractor chain when an injured employee's direct employer, the subcontractor, fails to secure workers' compensation insurance." *Am. Rd. Lines v. Workers' Comp. Appeal Bd. (Royal)*, 39 A.3d 603, 615 (Pa. Cmwlth. 2012) (citation omitted). "The Legislature's purpose in imposing this status upon general contractors was remedial, as it wished to ensure payment of workers' compensation benefits in the event of defaults by primarily liable subcontractors." *Patton*, 89 A.3d at 645 (citing *Qualp v. James Stewart Co.*, 109 A. 780, 782 (Pa. 1920)).

In *Six L's Packing Company v. Workers' Compensation Appeal Board (Williamson)*, 44 A.3d 1148 (Pa. 2012), the Pennsylvania Supreme Court addressed a challenge to a produce company's designation as a claimant's statutory employer under Section 302(a) of the Act. In *Six L's*, the produce company owned various

10

farms, distribution, and processing facilities in North America, and contracted with a transport company to transport produce between one of its warehouses and a processing facility. *Id*. at 1151. The claimant, while working for the transport company and transporting the produce company's produce, was injured in a vehicle crash. *Id*. The claimant filed claim petitions against the transport company and the produce company, but the transport company did not maintain workers' compensation insurance. *Id*. The Court addressed whether the produce company could be secondarily liable for the payment of workers' compensation benefits to the claimant as the claimant's "statutory employer." *Id*. While the produce company argued it did not own trucks or employ truck drivers and thus it was not the claimant's "statutory employer," the Court concluded the produce company was liable for payment. The Court explained:

> Viewing the statutory scheme as a whole . . . and employing the principle of liberal construction in furtherance of the Act's remedial purposes . . . we find it to be plain enough that the Legislature meant to require persons (including entities) contracting with others to perform work which is a regular or recurrent part of their businesses to assure that the employees of those others are covered by workers' compensation insurance, on pain of assuming secondary liability for benefits payment upon default.

*Id*. at 1158-59.

In *Zwick v. Workers' Compensation Appeal Board (Popchocoj)*, 106 A.3d 251 (Pa. Cmwlth. 2014), this Court applied *Six L's* reasoning to address whether a realtor was the "statutory employer" of a laborer working at one of his properties under Section 302(a) of the Act. In *Zwick*, the realtor, who rehabilitated properties for resale, hired a construction worker to perform construction work at one of his properties. *Id*. at 252. The construction worker hired the claimant to assist with the construction. *Id*. While working at the realtor's property, the claimant injured his

hand resulting in amputations of his pinky finger and thumb. *Id*. at 252-53. The construction worker did not have workers' compensation insurance and the claimant filed a claim petition for benefits from the Fund, which filed a petition to join the realtor as an additional employer. *Id*. The realtor argued he was not the claimant's statutory employer because the construction work the claimant was performing at the time of his injury was not a regular or recurrent part of the realtor's business. *Id*. at 254. This Court disagreed, noting the "record belie[d] this claim" and outlining the following relevant evidence:

> [The realtor] testified that construction rehabilitation was part of his business. . . . [The realtor] further testified that he hired [the construction worker] to do construction work at the [p]roperty to prepare it for resale and that [the realtor] was "essentially" the general contractor on the job. . . . [The realtor] also testified that [the construction worker] had previously done construction work for him at another property. . . . The WCJ credited [the realtor's] testimony. . . . The credited evidence supports the [Board's] conclusion that [the realtor] was in the business of rehabilitating properties for resale and that he hired [the construction worker] to perform work that was a regular part of his business. Therefore, [the realtor] met the definition of a "contractor" under Section 302(a) of the Act.

*Id*. at 255.

Likewise, in *Cargill Meats v. Workers' Compensation Appeal Board (Heffner)* (Pa. Cmwlth., No. 363 C.D. 2016, filed December 29, 2016),[4] this Court addressed whether a meat production company was the statutory employer of a truck driver under Section 302(a) of the Act. In *Cargill*, the meat production company hired a shipping carrier to transport its products from one of its facilities. *Id*., slip op. at 1. The claimant, a truck driver for the shipping carrier, suffered a cardiac

---

[4] This unreported opinion is cited for its persuasive value pursuant to Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

injury due to heavy exertion while at the meat production company's plant. *Id*. Because the shipping carrier did not maintain workers' compensation insurance, the claimant filed a claim petition against the Fund, and the Fund filed a petition to join the meat production company as an additional employer. *Id*. On appeal, the meat production company argued it was not the claimant's statutory employer under Section 302(a). *Id*. at 5. Specifically, the meat production company asserted the holding in *Six L's* should have been limited to cases where the statutory subcontractor performed services required to complete the manufacture of a finished product, which, in this case, was the processing of the meat. *Id*. Because the claimant was injured while transporting a finished product to customers, the meat production company contended it was not a regular, recurrent, or integral part of its business. *Id*. This Court disagreed, explaining:

> [The meat production company] stipulated that it has its own trucking distribution network; that it uses this trucking distribution network to transport its products from, among other places, its . . . facility where [the claimant] was injured; that it routinely uses the services of outside trucking companies such as [the shipping carrier] to handle its excess transportation needs for its products . . . ; and that it entered into a contract with [the shipping carrier] to transport products from its . . . facility. . . . Based on these facts, the Board correctly concluded that the transportation of the finished meat product to [the meat production company's] customers from [the meat production company's] facilities is a "regular or recurrent part" of [the meat production company's] business and that the Supreme Court's holding in *Six L's* is not distinguishable. Because [the claimant] was injured while performing this "regular or recurrent part" of [the meat production company's] business, the Board did not err in determining that the holding in *Six L's* governs this matter and that [the meat production company] was [the claimant's] statutory employer under Section 302(a) of the Act.

*Id*. at 6.

Here, the WCJ found, and the record supports, the following. The Housing Authority provides housing to low-income individuals. While the Housing Authority may not be in the business of construction, a "regular or recurrent part" of its business is to maintain its 535 public housing units. Indeed, the Housing Authority's Maintenance Department rehabilitates the apartments, performs general upkeep of the grounds, and performs preventative and routine maintenance. Encompassed within the Maintenance Department's responsibilities is the maintenance of the roofs of its housing facilities, which includes repairing minor leaks and replacing shingles. Ultimately, the Housing Authority, being in the business of providing and maintaining housing, is responsible for ensuring that its housing facilities have roofs, and that those roofs are maintained. To fulfill this responsibility, the Housing Authority hires contractors to perform necessary roof work.

In light of these facts found by the WCJ, the Board correctly concluded that maintaining the roofs of its housing facilities is a "regular or recurrent part" of the Housing Authority's business. The Housing Authority contracted with Kylor to perform this work, and thus the Housing Authority is a contractor, and Kylor is a subcontractor under Section 302(a) of the Act. Claimant, Kylor's employee, was injured while performing this "regular or recurrent part" of the Housing Authority's business. Accordingly, the Housing Authority is Claimant's statutory employer under Section 302(a) of the Act.

The Housing Authority argues Claimant "was trespassing on the date of the injury" and "there can be no statutory liability for an injured worker who was not approved to be on the property of [the Housing Authority]." Hous. Auth.'s Br. at 13, 15. We disagree with the Housing Authority's assertion. First, the WCJ found,

14

and the record supports, that while Claimant was not approved by the Housing Authority to work on the Fairview Hills project, Claimant was told by his employer to report to the Fairview Hills project and to "blend in." C.R. at 136. Moreover, the WCJ found Inspector observed Claimant working at the jobsite when he was on the roof with him. *Id*. These findings undermine the Housing Authority's claim that Claimant was "trespassing" because the WCJ found Claimant was directed to report to the jobsite, Claimant was working at the jobsite, and the Housing Authority, through Inspector, knew Claimant was working on the Fairview Hills project.

Further, even if we accepted the Housing Authority's assertion that it did not know Claimant was working on the Fairview Hills project with Kylor, as the Board properly noted: "Whether Claimant was permitted on the job site does not affect the nature of [the Housing Authority's] business relationship to [Kylor] in relation to the project on which Claimant was injured, which is the relevant inquiry under Section 302(a) of the Act." *Id.* at 210. The statute contains no language limiting its application in such a way that a statutory employer can avoid liability for workers' compensation benefits to a claimant if it did not approve a claimant to work on a jobsite. The clearest indication of legislative intent is the plain language of a statute, *see Office of Governor v. Donahue*, 98 A.3d 1223, 1237-38 (Pa. 2014), and the plain language of Section 302(a) of the Act provides the business relationship between the contractor and subcontractor is the relevant consideration. We decline to supply provisions in a statute that the Legislature did not include because it "is not our role . . . to engage in judicial legislation and to rewrite a statute in order to supply terms which are not present therein." *In re Nov. 3, 2020 Gen. Election*, 240 A.3d 591, 611 (Pa. 2020). Furthermore, even if we believed this was a "borderline interpretation"

15

of the Act, we would "construe[ it] in the injured party's favor." *Tooey*, 81 A.3d at 858 (citation omitted).

The Housing Authority further argues it should not be deemed Claimant's statutory employer "as a matter of public policy" because it required Kylor to maintain workers' compensation insurance coverage for its employees. Hous. Auth.'s Br. at 16-17. Notably, the Act is remedial legislation with the humanitarian purpose of benefiting injured workers. *Gallie v. Workers' Comp. Appeal Bd. (Fichtel & Sachs Indus.)*, 859 A.2d 1286 (Pa. 2004). The particular goal of Section 302(a) of the Act is to ensure that contractors are secondarily liable for benefits payments to their subcontractors' injured employees if those employees are not covered by workers' compensation insurance. *See Six L's*, 44 A.3d at 1158-59. "The Legislature[] . . . wished to ensure payment of workers' compensation benefits in the event of defaults by primarily liable subcontractors." *Patton*, 89 A.3d at 645. Here, Claimant is an injured worker who, regardless of the Housing Authority's requirements for Kylor, was not covered by workers' compensation insurance through Kylor. We cannot agree that as a matter of "public policy," Claimant should not be afforded the benefit of Section 302(a) of the Act's condition that the Housing Authority, as the contractor, is secondarily liable for the payment of benefits. Such an application would be contrary to the humanitarian purpose of the Act.

## CONCLUSION

For the foregoing reasons, we affirm the Board's Order.

_____
STACY WALLACE, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Altoona Housing Authority, : 
                       Petitioner : 
                                 : 
       v. : 
                                 : 
Garrett Beckenbaugh, Frank Winston : 
Crum Insurance Company, Inc., Kylor : 
Contracting LLC, State Workers' : 
Insurance Fund, and Uninsured : 
Employers Guaranty Fund (Workers' : 
Compensation Appeal Board), : No. 856 C.D. 2024
                     Respondents :

## **O R D E R**

    **AND NOW**, this 15th day of August 2025, the June 7, 2024 order of the Workers' Compensation Appeal Board is **AFFIRMED**.

 

_____
STACY WALLACE, Judge